# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DONALD D. MILLER REVOCABLE FAMILY TRUST, trustee Donald D. Miller, on behalf of itself, and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-18-0199-JH |
| DCP OPERATING COMPANY, LP; and DCP MIDSTREAM, LP, | ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF BRADLEY E. BECKWORTH IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
FILED ON BEHALF OF NIX PATTERSON, LLP**

I, Bradley E. Beckworth of Nix Patterson, LLP ("NP") declare as follows:

1.      I am a partner at NP. I submit this declaration in support of Class Representative's Motion for Final Approval ("Approval Motion"), Class Counsel's Motion for Approval of Attorneys' Fees ("Fee Motion"), and Class Counsel's Motion for Approval of Reimbursement of Litigation Expenses ("Expense Motion"), which are filed contemporaneously herewith. Unless otherwise stated herein, the statements made herein are based upon my personal knowledge and information available to me to the best of my recollection, and while I do not believe there are any errors, omissions, incomplete or incorrect statements, to the extent any occur, they are wholly accidental and unintentional.

2.      I, and my law firm NP, have litigated class actions and complex commercial litigation in the United Stated District Courts for the Eastern District of Oklahoma, the Western District of Oklahoma, and the Northern District of Oklahoma, the state courts of Oklahoma, and numerous other state and federal courts around the country. A copy of NP's Summary Resume, as

well as a brief biography of the NP attorneys who worked on this Litigation, is attached hereto as Exhibit 1.

3. NP, along with Whitten Burrage ("WB"), are court-appointed Class Counsel for Plaintiff and the Settlement Class. I personally rendered legal services and had co-responsibility for coordinating and leading the activity carried out by attorneys at NP in this Litigation. As Co-Lead counsel for Plaintiff, Donald D. Miller Revocable Family Trust, trustee Donald D. Miller ("Plaintiff," and/or "Class Representative"), NP significantly contributed to this Litigation and performed work on behalf of and for the benefit of the Settlement Class. NP was intimately involved in all aspects of the Litigation on behalf of Class Representative both prior to filing and while the matter was pending.

4. The information in this declaration regarding NP's time and expenses is based upon records maintained by NP in the ordinary course of business. I am the partner who oversaw and/or conducted the day-to-day activities in the Litigation. This declaration was prepared with the assistance of other lawyers and staff at NP with knowledge of the matters reflected herein and reviewed in detail by me before signing. As discussed herein, as well as the Declaration of Whitten Burrage, Class Counsel were retained by Plaintiff to prosecute this case on a fully contingent basis. Plaintiff negotiated, and we agreed to, a contract to prosecute this case on a fully contingent basis with a fee arrangement of up to 40% of any recovery obtained for Plaintiff and/or the putative class. I believe, and numerous state and federal courts in Oklahoma have determined, that a 40% contingent fee is within the appropriate market rate range for cases of this nature. In a class action settlement like this one, where no fee shifting or other payment of fees and expenses from the losing or adverse party occurs, it is very clear that the equitable common fund doctrine controls and the absent class members should share in payment of the fee by having the appropriate

2

percentage assessed against the settlement fund as a whole. Indeed, the application of the federal equitable common fund doctrine is a bedrock premise of litigation in this country and has repeatedly been applied by the United States Supreme Court, the Tenth Circuit, Oklahoma federal district courts, every federal circuit, and legal scholars. Otherwise, the absent class members would get a windfall at the expense of Class Counsel and Plaintiff. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165 (1939); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988); *Court-Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237, 250 (3d Cir. 1985). Further, in the present case, Plaintiff and Defendants DCP Operating Company, LP and DCP Midstream, LP ("Defendants") have contractually agreed that "the right to and reasonableness of Plaintiff's Attorneys' Fees and Litigation Expenses" shall be governed by "federal law, both substantive and procedural … and all other matters for which there is federal procedural or common law, including federal law regarding federal equitable common fund class actions." *See* Settlement Agreement, ¶11.8. Federal common law in the Tenth Circuit clearly states that use of the percentage of the recovery is the preferred method for calculating fee awards in common fund class actions. *Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451 (10th Cir. 1988); *Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849 (10th Cir. 1993). Moreover, in *Strack v. Continental Res., Inc.*, 2021 OK 21, __ P.3d __, the Oklahoma Supreme Court held that, under Oklahoma law, the percentage method is a permissible method for awarding attorneys' fees in a common fund class action. *Id*. at ¶¶16-17, 19. Thus, the contractually agreed 40% contingent fee amount is the amount under which Plaintiff and Class Counsel worked at all times, and that is the amount by which the reasonableness of the fee request should be considered.

5. Put simply, the application of hourly rates on a "pay as you go" basis could not and would not work here. Plaintiff could not afford to pay for the fees and expenses it took to litigate this matter to completion (or the enormous additional cost it would have taken to go to trial); further, based upon my personal experience and conversations with many absent class members in many cases, including discussions with absent class members and other clients in royalty cases, I believe the same is true for the overwhelming majority of absent class members. And, as a professional matter, neither me, my firm, nor my partners could or would have agreed to take on this litigation on an hourly basis where we advanced costs and expenses and worked at risk of non-payment only to be paid an hourly rate if, and only if, we obtained a full recovery for our client and absent class members. I have personally interviewed lawyers from some of the top hourly-based (defense-sided) commercial firms in the country, including several who perform energy litigation services and, to a person, each of them has verified that neither they nor their firm would work on a case like this one for a plaintiff and putative class on an hourly basis, without guarantee of payment, at their standard hourly rates without a guarantee of a substantial multiplier. And, even then, most still would not agree to advance costs and expenses. In the interest of privacy, I am not setting forth these attorneys' names but would be happy to do so under seal for the Court's *in camera* review if requested. Further, there is a complete paucity of law firms who are both capable of successfully litigating a case like this one to judgment and also funding all costs and expenses on a contingent basis. The cost of notice and administration alone is more than most firms can afford to advance on a contingent basis and, as such, if a class is certified and notice must be issued, most firms cannot afford to advance such costs on top of the post-certification expense of preparing for trial. The inability to fund such costs on a contingent basis not only limits the number of firms both available and competent to prosecute a case like this one, but also severely undercuts

class members' ability to hold out for the best result or try a case to completion if necessary. This fact of business is a troublesome one for most firms and their clients, and that trouble is compounded by the fact that the defendant in most royalty cases is a well-funded oil company with its own internal legal department and a cadre of top outside counsel who work by the hour, get paid every two weeks within a few days of submitting an invoice, and who have no risk of non-payment or advancing costs, whether they win or lose.

6. Our firm, NP, and our litigation team in this case, are able to both work on a contingent basis and fund costs and expenses as needed to take a case to trial, obtain a judgment and exhaust all appeals. Our ability in this regard is rare. That ability, combined with the considerable risk we incur when taking a case under such circumstances, is one reason why the market rate for our services is 40%.

7. Nevertheless, in addition to the contractually agreed upon 40% contingent fee market rate, there is an hourly rate that Class Counsel bill at in the event a Court determines it is appropriate to consider Counsel's hourly rates to determine whether any fee request is fair and reasonable when applied to the Settlement Class as a whole. To be clear, Plaintiff did not agree to pay these rates, nor could it afford to. The use of an hourly rate in a contingent fee case is an inefficient endeavor and, to put it simply, patently unreasonable in the context of commercial litigation. This is so because, unlike our adversaries, who work by the hour with no out of pocket expenses and are guaranteed payment no matter whether they win, lose or settle, and no matter whether they achieve a good or horrible result for their client, we must advance all costs and expenses, work entirely at risk, lose the ability to take on other paying work, and run the risk that we will lose both the value of our time and expenses if we lose. Further, our goal is always to achieve the best result possible for the class under the circumstances at the time and, if possible,

5

resolve all claims as quickly and efficiently as possible. If that means we can obtain a fair and reasonable settlement the day we file the case, we will do so; if that means we must get a case certified, uphold that certification on appeal, then try the case to verdict and judgment, and then uphold that judgment on appeal, we will do so. Put simply, we will—as we have demonstrated in many cases—prosecute a case through trial and all appeals, completely at risk of non-payment and total and utter loss.

8. This case was filed nearly three years ago, May 31, 2018. Because NP is a relatively small firm, prosecution of this litigation required the devotion of substantial time, manpower and resources from Class Counsel over that period. Further, NP has spent a substantial amount of time and effort in negotiating and preparing the necessary paperwork related to the Settlement with Defendants.

9. Based upon my experience, knowledge, education, study, and professional qualifications, I believe that the 40% contingent fee we agreed to with Plaintiff is the market rate for this case and is fair and reasonable and, further, that the hourly rates for me, NP and our co-counsel are well below market rate for cases prosecuted on a contingent basis.

10. I am personally experienced and qualified to offer evidence regarding what I believe are reasonable attorney rates in Oklahoma multi-state class actions. Among other things, my qualifications are as follows: I graduated *Magna Cum Laude* from Texas A&M University in College Station, Texas in May 1994, with a major in English and double minor in Psychology and Latin. During college, I worked during the summers at Andrews Kurth and Vinson & Elkins in Houston, Texas. While at Vinson & Elkins, I performed clerical duties that involved submitting billing invoices to the firm's clients. After graduation from Texas A&M, I was awarded a full scholarship to attend Baylor Law School in Waco, Texas. At Baylor Law School, I was a member

of the *Baylor Law Review*. I was an active member of the Baylor national advocacy teams in national moot court and trial competitions. I was named the Best Oral Advocate in the National Moot Court Competition Regional Championship hosted at the University of Oklahoma School of Law in Norman, Oklahoma, in November 1995. I was named the Best Oral Advocate in the ABA's National Moot Court Competition Regional Championships in San Francisco in April 1996 and again in Seattle in April 1997. I also was a member of the Baylor Law School National Mock Trial Team during this same time and won Third Place Team in the National Mock Trial Competition in April 1997. Baylor Law School awarded me the Leon Jaworski Advocacy Scholarship at Baylor Law School. During law school, I was a summer associate at several top firms that used traditional hourly billing. Those firms included Bracewell & Patterson (now Bracewell), Fulbright & Jaworski (now Norton Rose Fulbright), Akin, Gump and King & Spalding. During those clerkships, I was required to document hours that were charged to clients for matters I worked on. I graduated *cum laude* from Baylor Law School in May 1997. I later served as an adjunct professor at Baylor Law School, teaching advanced trial advocacy.

11. After graduating from Baylor Law School, I served as the judicial law clerk to the Honorable Richard Schell, Chief Judge for the United States District Court for the Eastern District of Texas. During my clerkship with Judge Schell, I had many opportunities to observe and work on complex commercial litigation, including class action litigation, and meet with top contingent fee and hourly litigation attorneys from all over the country. I learned a great deal about the differences in both types of fee structures, the rates charged by top attorneys locally and nationally, and the risks, rewards, and sometimes dire consequences of at-risk fee structures.

12. After completing my judicial clerkship, I went to work for NP in September 1998. I have been a partner at NP since 2005. During my tenure at NP, I have led complex commercial

cases and class actions in federal and state courts across the country. Our firm model is to work on a fully contingent basis. From time to time we engage in alternative fee arrangements, and I have tried a case to judgment where the entire fee was calculated on a traditional hourly basis. However, the overwhelming majority of our cases are done on a contingent basis. During this time, NP has been at the forefront of high-stakes, high-profile and high-risk litigation, including the largest recovery in the history of the United States judicial system—$17.2 billion on behalf of the State of Texas in the Texas Tobacco Litigation. NP obtained over $3 billion in recoveries for the State of Florida and other clients in litigation resulting from the Deepwater Horizon oil spill disaster. And, in the first trial of its kind, NP, with co-counsel Whitten Burrage, obtained a $400 million dollar verdict for the State of Oklahoma against Johnson & Johnson for its role in the opioid crisis in *State of Oklahoma v. Purdue Pharma, LP, et al.* Coupled with the settlements reached in that case, NP recovered nearly $1 billion on behalf of the State.

13. I am licensed to practice in Oklahoma, Texas, Arkansas, and New York. I am licensed to practice in several federal courts across the United States, such as the Southern District of New York and the Eastern and Western Districts of Oklahoma. Over the past twenty (20) years, I have led, tried and/or settled major litigation across the country (including in Oklahoma) involving complex commercial cases, class actions, personal injury matters, intellectual property matters, governmental representation and oil and gas litigation. In addition to the opioid litigation, a short list of examples of complex commercial cases I have led in state and federal courts around the country is: *Brocade Securities Litigation* ($160.1 million settlement in the first major securities fraud case regarding "stock options" backdating); *Delphi Securities Litigation* ($284.1 million settlement in one of the largest securities fraud settlements funded by a debtor outside of insurance, plus a $38.25 million settlement with Delphi's former auditor, Deloitte & Touche); *MoneyGram*

*Securities Litigation* ($80 million settlement, one of the top settlements in all "subprime" cases); *CompSource et al. v. BNY Mellon, N.A. et al.* ($280 million settlement in securities lending breach of contract/fiduciary duty litigation); *The Chickasaw Nation and The Choctaw Nation v. United States Dept. of Interior, et al.* ($186 million settlement in historic litigation involving allegations that the federal government mismanaged over 1.3 million acres of the timber lands belonging to the Chickasaw and Choctaw Nations); *In re MGM Mirage Securities Litigation* ($75 million settlement in largest securities class action recovery in the history of the District of Nevada). I also served as lead counsel for Heisman Trophy winner, Johnny Manziel, in an extremely high profile NCAA enforcement action, where NP defended against the NCAA's substantial allegations and ultimately negotiated an agreed two-quarter suspension for Mr. Manziel during one non-conference game and went on to run strategy for his 2014 NFL draft campaign in which he was the first quarterback under 6' tall to be drafted in the first round in the modern era of the NFL.

14. Notably, in many of the cases listed above, I was lead counsel on behalf of large Oklahoma institutions and/or governments in complex commercial litigation prosecuted both in Oklahoma and/or in other states, and all of those cases were conducted on a contingent basis. Those clients included the Oklahoma Teacher Retirement System (Southern District of New York Bankruptcy Court, Eastern District of Michigan and District of Minnesota), the Oklahoma Law Enforcement Retirement System (Eastern District of Michigan), CompSource Oklahoma (Eastern District of Oklahoma), and the Choctaw and Chickasaw Nations (Western District of Oklahoma). I have also negotiated contracts with and successfully represented the States of Alaska, Utah and Montana. Through representing these and other entities both in and outside of Oklahoma, in state, federal and bankruptcy courts, I have learned what fee rates are fair and reasonable generally and with respect to my and my firm's services, as well as what our adversaries, who work by the hour,

charge. Further, many of the cases listed above involved a complex commercial class action where the client negotiated a fee arrangement but the court ultimately had to approve the fee as fair and reasonable. In all such cases, the court approved our fees as fair and reasonable and used a percentage of the recovery method in doing so.

15. In addition to these cases, I have had the opportunity to represent Oklahoma royalty owners in a variety of cases in state and federal court in Oklahoma. Such cases include: *Pummill, et al. v. Cimarex Energy Co., et al.*, No. CV-2011-82 (Grady Co., Okla.) (obtained summary judgment order regarding payment of statutory interest without a demand, later affirmed by Oklahoma Supreme Court, and successfully tried three remaining declaratory judgments); *Cline v. Sunoco, Inc.*, No. 6:17-cv-313-JAG (E.D. Okla.) (obtained $156 million judgment for class of owners for failure to pay statutory interest under the PRSA); *Chieftain Royalty Co. v. SM Energy Co.*, No. 18-cv-1225-J (W.D. Okla.) ($10 million settlement for class of royalty owners approved April 27, 2021); *McClintock v. Enterprise Crude Oil LLC*, No. 6:16-cv-00136-KEW (E.D. Okla.) ($5.9 million cash settlement for class of royalty owners approved March 26, 2021); *Chieftain Royalty Co. v. Newfield Exploration Mid-Continent Inc.*, No. 17-cv-336-KEW (E.D. Okla.) ($19.5 million cash settlement for class of royalty owners); *Chieftain Royalty Co. v. Marathon Oil Co.*, Case No. CIV-17-334-SPS (E.D. Okla.) ($14.95 million cash settlement for class of royalty owners and at least $17.1 million in future benefits); *Reirdon v. Cimarex Energy Co.*, Case No. 6:16-cv-113-KEW (E.D. Okla.) ($9.5 million cash settlement for class of royalty owners and at least $11 million in future benefits); *Chieftain Royalty Co. v. XTO Energy, Inc.*, Case No. 6:11-cv-29-KEW (E.D. Okla.) ($80 million cash settlement for class of underpaid royalty owners, with at least $60 million in past benefits and $74 million in future benefits); *Reirdon v. XTO Energy, Inc.*, Case No. 6:16-cv-87-KEW (cash payment of $20 million and at least $20 million in future benefits);

10

*Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, Case No. 5:12-cv-1319-D (W.D. Okla.) (class settlement of $6.6 million); *Chieftain Royalty Co. v. SM Energy Co., et al.*, Case No. 5:11-cv-177-D (W.D. Okla.) ($52 million cash settlement for class of underpaid royalty owners and at least $2.9 million in future benefits); *Chieftain Royalty Co. v. QEP Energy Co.*, 5:11-cv-212-R (W.D. Okla.) ($155 million settlement for class of underpaid royalty owners, including $115 million in cash and at least $40 million in future benefits); *Drummond et al. v. Range Resources-Midcontinent, LLC, et al.*, Case No. CJ-2010-510 (Grady Co., Okla.) ($87.5 million cash settlement for class of underpaid royalty owners); *Cecil v. Ward Petroleum Corp.*, Case No. CJ-2010-462 (Grady Co., Okla.) ($10 million cash settlement for class of underpaid royalty owners); OCC Cause Nos. 201105057, 201105112 and 201105113 (obtained an Order from the Oklahoma Corporation Commission ("OCC") dismissing three applications filed by Range Production Company requesting the OCC to interpret OCC drilling and spacing orders in a manner that would curtail the rights of over a million Oklahoma royalty owners).

16.     During my career, I have had an opportunity to clerk for, and later work against and with, some of the preeminent attorneys in the country. During those times, I have consulted with and interviewed other lawyers, including my adversaries in litigation, to learn about and examine how they negotiated their various fee engagements and to understand whether and upon what circumstances they would engage in contingent fee litigation or work by the hour, on a lodestar basis, without guarantee of payment. The list of lawyers I have discussed such matters with is long and includes, but is not limited, to such firms as Whitten Burrage, Irell & Manella, Norton Rose Fulbright, Vinson & Elkins, King & Spalding, Akin Gump, Bracewell, Boies Schiller Flexner, Wilmer Hale, Winstead, and others. I worked at some of these firms when in college and law school. I worked on client billing for a major law firm in college. I submitted hourly charges as a

summer associate at several of these firms while in law school. In the interim between graduating law school and beginning my federal judicial clerkship, I worked at Bracewell as a law school graduate and billed for my time. Many of these firms also include attorneys who do extensive oil and gas litigation. I have discussed with such attorneys the rates they charge when billing by the hour, whether they will work on a contingent basis and, if so, at what rates, and whether they will work at-risk, advance all costs and expenses, and then charge an hourly rate with no guarantee of payment or a guaranteed multiplier in any complex litigation or class action. I also have discussed the types of fee rates such attorneys charge based on geography and volume of business and whether they would adjust their hourly rates simply because a case was pending in a small-town venue if that case involved multi-state complex issues like this one. My conversations with these and other attorneys provide me with significant knowledge, expertise and qualifications in understanding fee arrangements nationally and in Oklahoma.

17. Further, I have discussed fee arrangements with several former federal judges. For example, I have had the opportunity to work as co-counsel with former United States District Judge Michael Burrage on several occasions. I have discussed the market rate for contingent fee and hourly work in numerous cases with Judge Burrage. I have had similar discussions with Layn Phillips, former United States District Judge for the Western District of Oklahoma. Judge Phillips has mediated several complex cases in which I have been involved, including *CompSource v. BNY*, and has opined on the fairness of settlements and fee requests in many cases. Judge Phillips has been involved in complex commercial and class action cases across the country, including in the state and federal courts in Oklahoma. I have had similar discussions with former Chief Judge of the Oklahoma Court of Civil Appeals, William C. Hetherington, Jr. Judge Hetherington has twenty-eight years of service to the Oklahoma Judicial Branch. Similarly, I have had the

opportunity to discuss hourly rates and enhancement factors in complex litigation with Retired United States Judge T. John Ward who, as a judge in the Eastern District of Texas, presided over some of the more complex patent cases in United States history. These cases involved lawyers from the preeminent firms in the country, who were called to try cases in a small, rural East Texas town, and often required the court to assess hourly rates and enhancement factors in fee shifting cases upon a finding of willful infringement by a jury. My conversations and experiences with these former judges, and other judges in federal and state court, provide me with significant knowledge, expertise and qualifications in understanding fee arrangements and rates nationally and in Oklahoma.

18.     I also have had the opportunity throughout my career to work with and discuss contingent fee arrangements with Oklahoma practitioners. In addition to former federal Judges Burrage and Phillips discussed above, I have had the opportunity to work both with and against former United States Attorney Pat Ryan. For example, in the *CompSource v. BNY* litigation, Mr. Ryan represented the defendant in a bitterly fought litigation that went on for years. Mr. Ryan and I are now co-counsel in several cases. I have had the opportunity to work with and for Mr. Dan Little, a prominent Oklahoma attorney and royalty owner. I also worked together with former Oklahoma Attorney General Drew Edmondson and the Office of the Oklahoma Attorney General when representing several Oklahoma entities in complex commercial litigation, including cases that derived out of conduct in Oklahoma that had to be prosecuted in locations such as Minnesota, New York, Michigan, and Oklahoma. In connection with my extensive work on behalf of the State of Oklahoma, I have negotiated fees with the State, both in direct cases (including in the historic opioids litigation) and where a state entity was a representative in class actions. These negotiated fees are always on a contingent basis (which is allowed by Oklahoma law). This further

demonstrates my knowledge of the market rate in Oklahoma for complex matters. I also have had the opportunity to represent and negotiate fees with the Chickasaw and Choctaw Nations of Oklahoma in complex litigation. And I have worked with and negotiated contracts with governmental clients, including representatives of the offices of various attorneys general, in several other states. I have worked with co-counsel Whitten Burrage in state and federal courts in Oklahoma, as well as in matters before the OCC. Reggie Whitten and Judge Michael Burrage are widely regarded as two of the most preeminent attorneys in the State of Oklahoma. I have prosecuted numerous cases to judgment with Whitten Burrage. I am familiar with the rates they charge on a contingent basis and when working by the hour for royalty owners and in the instances where an energy company has hired them to do hourly work with guaranteed payment. My conversations and experiences with these Oklahoma attorneys and others provide me with significant knowledge, expertise and qualifications in understanding fee arrangements and rates in Oklahoma.

19. During the course of my career, I also have had the opportunity to discuss and negotiate fee arrangements with many actual and prospective clients. My client base has ranged from individuals of very meager and humble means to multi-billion dollar state investment funds, to attorneys general on behalf of states, to major corporations. I have represented many royalty owners in Oklahoma as well. My conversations and experiences with these actual and prospective clients provide me with knowledge, expertise and qualifications in understanding fee arrangements and rates nationally and in Oklahoma.

20. During the course of my career, I also have conducted extensive conversations, research and analysis on these matters with scholars who focus on the market rates for contingent fees in the country. One such expert is Professor Arthur Miller. Professor Miller is the author of

the premier treatise on federal courts: Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*. I had the privilege to work directly with Professor Miller in a complex class action case in federal court in Texarkana, Texas, *In re Triton Securities Litigation*, where I was co-lead counsel. Professor Miller and I argued the class certification hearing together in that case (which we settled for $49.5 million). I have known and discussed fees with Professor Charlie Silver of the University of Texas for many years. Professor Silver is considered one of the premier scholars on attorneys' fees in the country. *See, e.g.,* Charles M. Silver et al., *Law of Class Actions and Other Aggregate Litigation* (2013). I have worked with Professor Geoffrey Miller for more than a decade and have studied his work on fees extensively. Geoffrey Miller has conducted extensive studies based upon empirical evidence regarding the market rate for contingent fees, the rates approved by federal and state judges in litigation and bankruptcy matters across the country, and the rates charged by attorneys working on a contingent basis compared to those working on a guaranteed hourly basis. Similarly, I have worked with Professor Steven Gensler for several years and have had many extensive conversations with Professor Gensler regarding attorneys' fees in complex class actions. Professor Gensler is the Gene and Elaine Edwards Family Chair in Law at the University of Oklahoma College of Law, where he teaches Civil Procedure and related classes. My conversations and experiences with these and other scholars provide me with knowledge, expertise and qualifications in understanding fee arrangements and rates nationally and in Oklahoma.

21. Further, throughout my career, I have studied case law, scholarly articles, and reports regarding the market rates for contingent fee litigation in Oklahoma and across the country. I have studied court filings and judicial holdings (including many cases approving of my firm's fee requests and rates). I also have reviewed fee requests submitted by contingent plaintiffs'

counsel in purely contingent cases, requests for attorneys' fee payment in fee shifting cases, and requests for payment by hourly attorneys working on a guaranteed fee payment structure in both fee shifting cases and in bankruptcy matters where their fees must be approved. My studies, analysis, conversations, and experiences with these matters provide me with knowledge, expertise and qualifications in understanding fee arrangements and rates nationally and in Oklahoma.

22. Based upon my own personal experiences, and the knowledge, skill and experience I have gained from my own work and study on this issue, I believe I have a unique level of knowledge, expertise, and qualification in the area of contingent fee arrangements in complex litigation that few attorneys possess. I have personally reviewed the rates that attorneys charge around the country when they are working in Oklahoma or elsewhere on complex litigation, including when they are not working at risk of non-payment and are not advancing costs and expenses. Based upon this research, study, and my twenty years of experience working in this field in courts from Oklahoma to New York to California, and being licensed in New York, Texas, Oklahoma and Arkansas, I can attest that a 40% contingent fee is the market rate for a complex, multi-state, royalty class action like this one. There are very few firms that have the skill, ability and funding necessary to prosecute a case like this one to verdict and judgment—and even fewer still that can do it correctly. The vast majority of law firms could not and would not take such a case on a contingent basis. Moreover, in my years of studying this topic and interviewing many of my colleagues, I have not found a single law firm that would agree to take on a case like this at an hourly rate and also agree that they would: (1) advance all costs and expenses, (2) only get paid that straight hourly rate if they obtained a settlement or judgment and, even then, (3) could only get paid upon judicial review and approval. To put that statement more clearly: no firm I have ever talked to would accept such an engagement. Not one. If there is any doubt about that statement, I

16

would encourage the Court to ask our opposing counsel in this case if (assuming they had no conflicts) they would ever agree to prosecute this case or one like it on a fully contingent basis, advancing all costs and expenses, without any guarantee of payment, at their normal straight hourly rate. I am confident the answer to that question would be a resounding "no." And, I am further confident that the answer to that question would be a resounding "no" from any law firm that traditionally conducts litigation on a pay-by-the-hour basis.

23. As a result of my education, experience, knowledge, skill, and qualifications in the area of attorneys' fees in complex commercial litigation, I believe the concept of setting an hourly rate in fully contingent cases always results in the hourly rate being grossly understated. This is so because no one (at least of those I have talked with) desires to advance costs and expenses and work by the hour with no guarantee of success without also negotiating a guaranteed multiple of that rate upon being successful. However, because some courts wish to apply a lodestar cross check to determine the fairness of a percentage fee in a complex class action case, and in some cases, it may be necessary to submit hourly rates to support a request for payment of attorneys' fees in a fee shifting scenario, we have established billable rates for our firm to use in such instances.

24. One of the factors that goes into setting hourly rates is the skill, experience, and qualification of counsel. The assessment of this factor is not an easy one to discuss in a written declaration. However, I will simply state that I believe my record, as well as those of my partners and associates at NP and my colleagues in this case speak for themselves. I, my law partner Jeff Angelovich, my other partners, and our associates have secured some of the largest recoveries in American legal history: $17.2 billion in the Texas Tobacco case; $3 billion in the BP Oil Spill case; over $4 billion in securities fraud and commercial class action recoveries; and nearly $1 billion to date in the Oklahoma Opioid litigation. Our associates are the best of the best. Unlike

associates at large commercial defense firms who often do not get meaningful experience early in their careers, our associates are expected to, and do in fact, have the ability to run and lead complex cases from the day they are licensed. We hire the best and believe they could bill at rates equivalent to lawyers at any firm anywhere. Nowhere has this fact been better demonstrated than in the State of Oklahoma's Opioid Litigation where our team, including many NP associates, won hearings, and conducted depositions and other major matters on a daily basis against dozens of senior lawyers from the biggest law firms in the country. Further, the law firm Whitten Burrage is one of the most accomplished trial law firms in Oklahoma. Its founders—Reggie Whitten and Judge Michael Burrage—have 80 years of combined trial experience, having successfully tried hundreds of jury trials. With an extensive background in complex litigation, Whitten Burrage is engaged in several of the largest and most significant ongoing lawsuits in the United States. In the case of *Burgess v. Farmers Insurance*, firm founders Reggie Whitten and Michael Burrage tried a two-week jury trial in Lawton, Oklahoma that resulted in the largest jury verdict in Oklahoma history—$130,000,000. Michael Burrage was the first Native American federal judge when he was appointed to the Eastern District of Oklahoma in 1994, and in 1996, he was sworn in as chief judge. Both Mr. Whitten and Judge Burrage were inducted into the Oklahoma Hall of Fame, the University of Oklahoma College of Law Hall of Fame, and the prestigious American College of Trial Lawyers. Thus, when assessing hourly rates, the skill, experience, and qualifications of the attorneys involved in this case is at the highest level, and each of these attorneys could charge rates that are at or above the rates charged by the most expensive lawyers in New York, Washington, D.C. or Los Angeles—and that is for cases where payment is guaranteed.

25. I have instructed the attorneys and staff at my firm working on this matter to keep records regarding their time, even though we are working on a fully contingent basis. At the close of this case, I asked each attorney and staff member at the firm to report to me regarding the time they spent prosecuting this matter. I have been provided with access to material information supporting the fee and expense requests that are the subject of this Declaration, and have reviewed such materials. As a result of this review, reductions were made to both time and expense in the exercise of "billing judgment." As a result of the review and the adjustments made, I believe the time and the expenses set forth below are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the Litigation.

26. Based on the work performed and this review of information reflecting work performed by attorneys at NP in this Litigation, I directed preparation of the chart set forth below identifying the names and positions of NP's attorneys and paraprofessionals who undertook litigation activities in connection with the Litigation, each individual's hourly rate, and the total number of hours each individual expended in connection with work on this Litigation.

27. As set forth below, NP's total number of hours in this Litigation to date is at least 1,562.65 hours. Further, we reasonably anticipate expending an additional 230 future hours through Final Approval and distribution of the Net Settlement Fund.[1]

| Name | Title | Hours | Rate |
|------|-------|-------|------|
| Bradley Beckworth | Sr. Partner | 150.00 | $875.00 |
| Jeff Angelovich | Sr. Partner | 74.25 | $875.00 |
| Susan Whatley | Partner | 35.00 | $700.00 |
| Lisa Baldwin | Partner | 15.00 | $700.00 |
| Trey Duck | Partner | 217.00 | $700.00 |
| Drew Pate | Partner | 552.20 | $700.00 |
| Cody Hill | Associate | 100.00 | $500.00 |
| Winn Cutler | Associate | 131.50 | $500.00 |

---

[1] This total does not include any future hours devoted to any potential appeal. In the event of an appeal, NP reserves the right to seek additional fees associated with any such appeal.

| James E. Warner III | Associate | 30.00 | $500.00 |
|---|---|---|---|
| Nathan Hall | Associate | 0.5 | $400.00 |
| Kim Saindon | Associate | 14.50 | $400.00 |
| Brooke Churchman[2] | Associate | 35.00 | $400.00 |
| Nikki Cameron | Paralegal | 79.50 | $250.00 |
| Maria Gomez | Legal Assistant | 21.60 | $250.00 |
| Shelley Prince | Legal Assistant | 57.00 | $250.00 |
| Brittany Kellogg | Paralegal | 34.10 | $250.00 |
| Amanda Thompson | Paralegal | 15.50 | $250.00 |

28.     In my judgment, the number of hours expended and the services performed by the attorneys at NP were reasonable and expended for the benefit of the Settlement Class in this Litigation. If the Court deems it necessary, NP can provide additional detail regarding the hours expended during this litigation. I believe this total number of hours is a conservative and understated amount because, among other things, all of our attorneys work extensively on many matters in a collaborative context where it is not possible to record every hour worked and/or not possible to reduce any given hour to only one case. Therefore, I believe my firm worked many more hours on this case than the hours listed above.

29.     To be clear, I believe that the percentage method must be used here. The Settlement Agreement clearly requires the application of federal procedural and common law. These are bargained-for terms. This bargain was not done for any collusive purpose. To the contrary, and without waiving any settlement privilege(s), I can state that these terms were negotiated and bargained for, for the purpose of assuring clarity and uniformity in the administration of the Settlement.

30.     Further, in the event the Court determines that this choice-of-law provision should be disregarded and Oklahoma law should be applied, the Court's analysis is no different. Oklahoma law allows trial courts to use the percentage of the recovery method. Indeed, in *Strack*

---

[2] Ms. Churchman is no longer with the firm.

20

*v. Continental Res., Inc.*, 2021 OK 21, cited *supra*, the Oklahoma Supreme Court made it clear that: (1) Oklahoma law has always allowed the application of the percentage-of-the-fund approach in common fund class actions, (2) that understanding was codified in Oklahoma's class action statute, 12 O.S. § 2023, and (3) that approach is consistent with other jurisdictions, including the Tenth Circuit. The *Strack* Court also held that a percentage-of-the-fund approach most directly measures the amount in controversy and the result obtained. Moreover, in another oil and gas case, several notable declarations related to Oklahoma law on attorney fees in common fund class actions were filed that are noteworthy here. Those are the declarations of the Honorable Justice Joseph Watt, Professor Steven Gensler, and Glenn Coffee. *See* Exhibits 2–4 (attached hereto). The declarants were opining about the reasonableness of fees under Oklahoma law and, as such, their opinions would be instructive here. Section 2023—alone—is the relevant Oklahoma law for determining class-action fee awards. *See* Coffee Decl., ¶10;[3] Watt Decl., ¶24.[4] And it contains no requirement that class counsel's fees be assessed on an hourly basis. Rather "in arriving at a fair and reasonable fee for class counsel," 2023 merely requires courts to consider thirteen (13) factors. 12 O.S. § 2023(G)(4)(e); Coffee Decl., ¶¶9-10; Watt Decl., ¶¶21-25. In stark contrast, its sister provision governing appointment of fee referees states the "attorney or referee shall be awarded reasonable fees by the court ***on an hourly basis*** out of the proceeds awarded to the class." 12 O.S. § 2023(G)(4)(d) (emphasis added). That the "hourly basis" language appears in subpart (d) but not in (e), proves the Oklahoma Legislature did not intend a lodestar analysis for class counsel fees.

---

[3] "Rule 2023(G) was drafted and intended to govern any award of attorneys' fees to class counsel in an Oklahoma class action."

[4] "[T]o the extent *Burk* ever had a role to play in class action fee awards, it is my opinion that any such role was supplanted by the enactment of 12 O.S. §2023(G)(4)(e)."

Coffee Decl., ¶¶23-28; Watt Decl., ¶22.[5]

31.     The legislative history of 2023 confirms that the Oklahoma Legislature repeatedly rejected efforts to require a lodestar methodology. Coffee Decl., ¶¶9-28. Bills were introduced in 2004, 2006, 2007, and 2009—all of which contained the phrase "the trial court **shall use the Lodestar rule** to calculate the amount of fees to be awarded to class counsel" and attempted to cap the allowable multiplier at 3 or 4 times the lodestar—and none ever became law. *Id.* ¶¶11-28 (emphasis added). Senator Coffee, who negotiated the language that *did* become the relevant law in Oklahoma, explains (*id*. ¶28):

> The Legislature did not draft or intend for Rule 2023 to impose a straight lodestar requirement or any multiplier cap on class counsel's fees in common fund cases or fee shifting cases. It was the Legislature's intent (1) to leave discretion with the courts when it came to choosing the objective marker on which to base its fee award—whether customary percentage or hourly rate—but (2) to make sure that, whichever objective marker the court used, it also accounted for the facts and circumstances unique to each case. Accordingly, the Legislature adopted a law that was silent as to the first issue, but provided mandatory guidance—an analysis of thirteen (13) factors—as to the second.

32.     The "customary fee" in Oklahoma royalty class actions over the past two decades is a contingency fee similar to the 40% fee agreed to by Class Representative here. Otherwise, Plaintiff, who is a sophisticated client in his own right, would not have agreed to it. Watt Decl., ¶¶25-28 & n.50; Gensler Decl., ¶¶35-67, 78-80, 89-92, 102-117.

33.     To summarize, Senator Coffee declares that, under Oklahoma law:

    A.    2023 does not require a straight lodestar and thus did not forbid use of a percentage method in contingent fee common fund cases;

    B.    The Oklahoma Legislature rejected every attempt to require a lodestar;

    C.    2023 does not place any type of cap on an enhancement multiplier when a lodestar is used;

---

[5] *See Loughrin v. United* States, 573 U.S. 351, 358 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone the very next provision—this court presumes that Congress intended a difference in meaning.").

D. The Oklahoma Legislature rejected every attempt to include any type of cap on an enhancement multiplier when a lodestar is used; and

E. The Legislature included a straight hourly rate for specially appointed referees in 2023(G)(4)(d), but expressly excluded any such language or requirement for class counsel in those same cases.[6]

Justice Watt declares that, under Oklahoma law:

A. Oklahoma law allows trial courts to use discretion to apply the percentage method in a contingent fee common fund class action;

B. When Oklahoma trial courts choose to use a lodestar analysis in such cases, an enhancement multiplier is used under 2023 and no caps apply;

C. When Oklahoma courts apply a lodestar (as a cross check), they typically find an enhancement multiplier of 3-8 appropriate in common fund cases;

D. The most important factor is the result obtained, even when a lodestar is used; and

E. Reconstructed time entries are allowed, and time spent in pursuit or defense of attorney fees, and time spent on appeal, are absolutely to be included in any lodestar analysis.[7]

And, Professor Steven Gensler, who is the leading scholar on Oklahoma fee law, agrees with Justice Watt.[8] Thus, while the Court need not look to Oklahoma law due to the Parties' choice of law provision, the fee request here is undoubtedly reasonable under Oklahoma law.

34. NP's hourly figures are based on its billing rates, which do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in the billing rates.

35. As set forth in the chart below, NP has incurred a total of $171,620.15 in unreimbursed expenses in connection with this Litigation as of the date of this Declaration. In my judgment, these expenses were reasonable, necessary, and critical to the prosecution of this Litigation.

---

[6] *See* Coffee Decl., ¶¶6-10, 26-28.
[7] *See* Watt Decl., ¶¶7-14, 21-36.
[8] *See* Gensler Decl., ¶¶4-11, 20-119.

| | Total Category Expense |
|---|---:|
| **Administrative Expenses** | |
| AT Conference | 64.80 |
| FedEx/Postage | 129.66 |
| Court Fees/ Filing/ Reporting/ Copies | 15,425.63 |
| **Litigation Support** | |
| Issus Discovery | 2,260.79 |
| Matlin Petroleum Co. | 525.00 |
| **Expert/Consulting Expenses** | |
| Barbara A. Ley | 126,268.33 |
| **Research & Investigation** | |
| Lexis Nexis | 2,384.80 |
| **Mediation Fees** | |
| Ferguson Malouf Law PLLC | 4,000.00 |
| **Travel Expenses** | |
| Lodging, Meals and Transportation | 20,561.14 |
| **TOTAL SUBMITTED EXPENSES** | **$171,620.15** |

36. NP has elected not to seek reimbursement for certain expenses and has capped the amount of travel-related expenses for which it will seek reimbursement. For example, from time to time, members of NP utilized private aircraft for transportation related to this case. NP believes the use of such transportation provides a significant benefit to our clients and the Settlement Class because it allows us to prosecute a case more quickly and efficiently and saves us the time and cost of wasting extra days out of town to make a commercial flight. For example, NP lawyers can fly directly from their primary offices in Austin, Texas, to Oklahoma City in less than one hour in private aircraft; however, it takes over five hours to drive to Oklahoma City and to fly commercially, one must either catch a series of flights or drive 2-3 hours to Dallas to take a direct flight to Oklahoma City, which results in a round trip of ten hours or more. Thus, we are able to avoid lost time, extra hotel stays and other inefficiencies. Additionally, we are able to access experts and witnesses on short notice. However, although we believe the use of private aircraft

provides such benefits, we have not submitted the full costs of such trips in this matter. Instead, for trips when a private aircraft was utilized and there was a commercial flight alternative, we have compared the cost of a refundable economy full fare for each passenger to the cost of using private aircraft and have submitted the lesser of the two. Thus, if it would have cost less to fly on a commercial flight, we have submitted the cost of such a commercial ticket and have written off the additional actual cost and passed the savings, as well as the savings of additional hotel nights on to our clients and the Class. In other words, we are writing off these additional charges even though we believe they provide an advantage to the Settlement Class.

37. These expenses are reflected on the books and records of NP. It is NP's policy and practice to prepare such records from expense vouchers, check records, credit card records, and other source materials. Based on my oversight of NP's work in connection with this litigation and my review of these records, I believe them to constitute an accurate record of the expenses actually incurred by the Firm in connection with this Litigation.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

DATED: May 26, 2021.

Bradley E. Beckworth
Nix Patterson, LLP