IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

DONALD D. MILLER REVOCABLE FAMILY )
TRUST, et al.,                    )
                                  )
            Plaintiffs,           )
                                  )
   vs.                            ) Case No. 18-CV-199-JH
                                  )
DCP OPERATING COMPANY, LP, and    )
DCP MIDSTREAM, LP,                )
                                  )
            Defendants.           )

TRANSCRIPT OF

CLASS ACTION FAIRNESS HEARING

JUNE 23, 2021, at 10:00 A.M.

BEFORE THE HONORABLE JOE HEATON, JUDGE PRESIDING

Recorded by mechanical stenography
Transcript produced by computer-aided transcription

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  Cassandra_Kerr@okwd.uscourts.gov

2

                    A P P E A R A N C E S

FOR THE PLAINTIFFS:

    Mr. Michael Burrage
    mburrage@whittenburragelaw.com
    Whitten Burrage
    512 North Broadway Avenue
    Suite 300
    Oklahoma City, Oklahoma 73102
    405-516-7800

    Mr. Andrew G. Pate
    apate@nixlaw.com
    Nix, Patterson & Roach
    205 Linda Drive
    Daingerfield, Texas 75638
    512-328-5333

    Mr. Trey Duck
    tduck@nixlaw.com
    Nix, Patterson & Roach
    3600 North Capital of Texas Highway
    Suite B-350
    Austin, Texas 78746
    512-328-5333


FOR THE DEFENDANTS:

    Mr. Daniel M. McClure
    dan.mcclure@nortonrosefulbright.com
    Norton, Rose, Fulbright US
    1301 McKinney
    Suite 5100
    Houston, Texas 77010-3095
    713-651-5151

(Call to Order of the Court.)

THE COURT:  Good morning everyone.  If you have been vaccinated, you're free to take your mask off, if you want to.  If you like leaving them on, you can do that too, but I suspect -- looks like everybody's got the second shot, so we'll proceed in that fashion.

This is *Miller Trust v. DCP Operating Company*, which, as the deputy indicated, is an Eastern District case, Number 18-199.

If Counsel would make your appearances for the record, please.

MR. PATE:  Good morning, Your Honor.  Drew Pate from Nix, Patterson on behalf of the class and class representative.

THE COURT:  Uh-huh.

MR. DUCK:  Trey Duck also from Nix, Patterson.

MR. BURRAGE:  Mike Burrage -- Whitten -- Whitten, Burrage -- on behalf of the class.

MR. MCCLURE:  Your Honor, Dan McClure for the DCP defendants.

THE COURT:  Now, I understand one of you was flagged as a potential terrorist trying to get in here this morning and get through security.  That --

MR. MCCLURE:  I'm sorry.  I got cleared after -- after I talked -- after your people talked to -- to the...

THE COURT:  Well, you look a little dangerous.  I can

understand why they would --

MR. MCCLURE:  Well, they were pointing fingers at me, so, you know, it kind of made it...

THE COURT:  Well, I don't doubt they would do that, but this -- this doesn't seem like the circumstance where they'd worry too much about having you here but...

Well, this is the final fairness hearing on the settlement that was reached and preliminarily approved by me some time ago.

Let me ask:  I don't -- before I moved this hearing here from Muskogee last week, I think we ran the traps informally through counsel.  Does anybody know of any person who was planning to be at Muskogee who's not here today because it was moved?

MR. PATE:  No, Your Honor.

THE COURT:  All right.

MR. MCCLURE:  No, Your Honor.

THE COURT:  I -- I presume that, you know, this is as convenient for everybody and perhaps more convenient for some than in Muskogee, but, certainly, it's more convenient for me, so I appreciate everybody's cooperation with respect to that.

We can proceed however you want to proceed here.  I -- I have substantial written submissions from the plaintiffs here on various issues in the case that I've -- I've -- I'm not going to say I've read all 8,000 pages of it, but I've been

through, I think, the bulk of it.

Let me just confirm for the record what I understand the circumstances to be.  One is that there have been zero objections filed to the proposed settlement; is that correct?

Mr. Pate, why don't you step to the podium here and we'll -- or Mr. Duck, whoever's going to be the lead horse here.

MR. PATE:  That'll be me today, Your Honor -- Drew Pate.  Nix, Patterson.

That's correct.  There are no objections that have been filed.  We're happy to report that, Your Honor.

THE COURT:  And the -- there were -- I think the indication was there were 17 that had sought to be excluded. That was mostly Kaiser-Francis that, I guess, is big enough to take care of itself without a class-action vehicle?

MR. PATE:  That -- that's right, Your Honor.

THE COURT:  And I remember we talked about this at the original hearing, but let me be certain I'm remembering it correctly.  I think the indication is that the payout that is reflected by the settlement here is, like, 92 or -3 percent of the alleged interest owed, and, if I remember -- the part I'm trying to be clear on is there was a statute of limitations issue involved here and that, effectively, that 92 percent reflects a 100 percent payment of interest amounts that are clearly within the statute of limitations and then a slight

discount for those that were beyond it.

MR. PATE:  That's --

THE COURT:  Is that a fair description?

MR. PATE:  That's correct, Your Honor.

THE COURT:  All right.  I have -- I had the -- I think yesterday there was filed by Mr. McClure, I think -- no. I'm sorry.  He had filed the notice relating to the attorney generals and all of that, but it was the filing from the plaintiffs, I believe, that -- with -- Ms. Keyo (phonetic), is it?

Her affidavit indicates that there were 5,000-and-some of the short notices that were returned, which sounds like a lot of returns to me, but tell me the -- give me the context there and how that came about.

MR. PATE:  Absolutely, Your Honor.  So 40 -- approximately 45,000 notices were sent out in this case by J&D -- the direct mail notice that was sent out -- the short form.  5,000 -- I know that sounds like a lot, and, doing a few of these at this point, Your Honor, when you're talking about 45,000 notices going out, that's actually not that many, or it's not any different than a lot of other cases we've had as far as the notice campaign.

THE COURT:  They were sent out, I assume, based on the pay deck for --

MR. PATE:  That's right, Your Honor.

And then what happens is they send an initial payment out -- or an initial notice out based on the data that we receive from DCP, plus their own investigation, to update those addresses as best they can.  They send their first wave out.

With -- for any that come back as undeliverable -- some of them -- they get a follow-up address that comes back with it that they're able to track, and they send those back out. Others, they're able to trace, again, on their own through follow-up investigation and send -- try to resend the notice. So approximately, I believe -- I can pull up the exact numbers. I believe that was -- around 2,000 of the 5,000 were re-sent. And so we think that it was, in large part, a very successful campaign.

For any individuals who did not receive the short form notice, of course, there is the publication notice that goes out, the -- and the website that is made available as well, Your Honor.

THE COURT:  Well, I would assume that that proportion -- the 5,000 out of 45,000 or whatever -- is not different from the experience that an oil company or a transmission company would normally have in sending out royalty checks.  I mean, you -- you spent more time traipsing through the records of those companies than I have, but I would assume that's --

MR. PATE:  I -- I agree, if not better, Your Honor,

8

honestly, as far as the -- the returns there.

And it's certainly not out of the ordinary for J&D's efforts as a class-action administrator with notice campaigns and the success they've had in being able to trace people down and issue as many follow-ups as possible.

THE COURT:  All right.

MR. PATE:  So we're -- we're confident that it was the best notice that was practical and could be accomplished in this situation, Your Honor.

THE COURT:  Mr. McClure, any qualms about the adequacy of notice and so on here --

MR. MCCLURE:  No, Your Honor.

THE COURT:  -- from the defendant?

MR. MCCLURE:  No -- no problems.

THE COURT:  All right.  In terms of the -- the -- the merits of -- of the settlement, I don't know that anything is -- obviously, with no objectors, I'm not sure anything's different than what I assessed back in -- what was it? -- March or April when we originally did this.

One thing I was curious about -- and I don't remember if I asked you this back in -- at that hearing or not, but I notice in the class definition you've excluded a couple of people by name based on a conflict or something.  What -- what was the nature of that exclusion?

MR. PATE:  Yes, Your Honor.  That is based on a -- a

conflict with -- under the professional rules that -- that we have based on us being in an active dispute with those individuals and their family members in another matter in which they had objected, and that goes on -- it relates to the *Intervest* case that you're aware of, Your Honor.  Most of those individuals -- and I don't have all the names in front of me, but all of those are based on a conflict of interest with -- with counsel, Your Honor.

THE COURT:  They were like objectors in another case?

MR. PATE:  Several of them, yes, Your Honor, were objectors in another case, and we have an ongoing dispute with them as a result of that objection.

THE COURT:  Okay.  Well, part of the reason I ask -- I -- I remember, when I was in the legislature 30-some years ago, I briefly served, I think, one term with a guy named Danny George, which is one of the guys that's excluded here.  I haven't kept track of him in the meantime.  He -- he kind of had an ornery streak to him, but I don't think that he was so obstreperous I would have excluded him, but I -- I would assume that is the basis, so...

MR. PATE:  There's typically a catch-all exclusion in the class definition, Your Honor, for individuals that we're prohibited from representing under the rules, and we just add specific names where appropriate, where we know that there is -- is somebody that we're prohibited from representing -- or

conflicted from representing.

THE COURT:  Okay.  Let me ask -- we're here with -- tell you what I think I'll do.  I think we'll give Mr. Burrage a chance to participate here.

In the proposed order that you asked me to approve, you had some language in there that said that I had considered the arguments that an objector might make at the hearing but didn't, and I don't know what those are.  So, Mr. Burrage, tell me what --

MR. BURRAGE:  I don't either, Judge.  I don't either.  I can think of some.

THE COURT:  Well, I'm -- I'm just harassing you, but the -- I'll -- I'll probably modify that order so that I don't suggest I've rejected the -- rejected arguments that weren't even made, so...

MR. BURRAGE:  Well, Judge, you know, Drew wanted to put that in there, and I did too, so...

THE COURT:  Okay.

MR. PATE:  We just try to anticipate all circumstances, Judge.

THE COURT:  Well, the -- it -- it seems to me, with respect to the -- the settlement itself, this is an easy -- an easy call.  The percentage -- or the percentage of recovery is -- is high, obviously.  It appears to be as about a complete a victory as -- as a plaintiffs' group could have achieved with

the 100 percent of interest being paid post -- poststatute of limitations.

Let me ask -- I'm just -- I'm curious, Mr. Pate.  The -- I recall the briefing that we had in this case.  You were -- you were talking about the impact of the *Pummill* decision, which was, what, District Court of Stephens County or somewhere --

MR. PATE:  Grady County.

THE COURT:  Grady County.

And that had been to the Supreme Court -- or the Court of Appeals in a couple of contexts, and it sounded like it was pretty close, though maybe not quite there, in terms of the Oklahoma courts having resolved the legal question of whether or not a demand for payment of interest was necessary or not.  What is the state of the law now, as you see it?

MR. PATE:  Well, our position is that the Oklahoma Supreme Court has affirmed that, Your Honor, as one of the four issues that was in *Pummill*.  That fourth issue -- our view is that was affirmed by the Supreme Court -- that no demand is required -- and that's -- I believe you're referring to the class certification briefing that we -- we previously filed before the settlement to your question.

And, ironically, that was also ruled on in another case that we had with Mr. McClure:  the *Cline v. Sunoco* case, which I'm sure you're familiar with from our briefing as well.  That was the PRSA interest class action that was tried in 2019 in

Muskogee to a verdict. And the Court in that case agreed that the -- that the Supreme Court -- Oklahoma Supreme Court in *Pummill* had answered that question and also agreed with the rationale, even if it hadn't. So that is, in our view, the state of the law with respect to the PRSA.

Now, obviously --

THE COURT: Well, in -- in the wake of that in particularly, I -- I do recall the -- you know, the news reports or something about the case that went to verdict.

Is that now viewed as -- as accepted even by the defendants in these cases, or does that continue to be litigated?

MR. PATE: I -- I can't speak for the defendants. It continues to be litigated. I would say it still remains a question of law and fact, you know, putting it in the context of why we're here today.

Now, we obviously think that the question --

THE COURT: Well, that -- that's what I'm --

MR. PATE: -- has been answered.

THE COURT: -- getting at. How big a question is it?

MR. PATE: The *Sunoco* case is on appeal.

Now, they're not appealing that aspect of the ruling, so I think the bigger questions in these cases, aside from whether a demand is required, revolve more around whether -- not to -- to put my defense lawyer hat on for a little bit -- whether a

13

class should be certified and certain other questions about how the damages are calculated and things like that, that remain in these cases.

I don't think it's a huge fight to say that a demand is not required anymore. In fact, a lot of these companies have agreed to change their practices. Some of them are even getting out of the business of paying royalty, but -- so I don't think that is as big a fight as it -- as it once was.

THE COURT: Mr. -- Mr. McClure, what's your take on that question?

MR. MCCLURE: Well, if you've got a couple of hours, I can give the defendants' take.

THE COURT: I need you to boil it down a little bit beyond that.

Do you see it as still a disputed question?

MR. MCCLURE: In -- in -- in many cases, yeah. I think so. It could be.

There's a lot to be said about *Pummill*. There's a lot to be said about the *Sunoco* decision.

I don't think it's definitively decided, and that's part of their reason for settling -- is that that's still kind of an issue that's not finally decided. I mean, the statute doesn't -- unfortunately, the statute has got a lot of defects in it. One defect is it doesn't say when -- when interest should be paid if interest is due: the time a late payment is

14

made or just exactly when.

And so the -- without, you know, going through the whole legal analysis, I still think it's still an open question, yeah, and -- for instance, in *Pummill*, it was never appealed by the defense counsel.  It was the trial court that entered the order.  It never got appealed, so the court -- Supreme Court, by the time it got there, said, "Well, I guess we can affirm that part of the lower court judgment," because it was not appealed and was not -- it was conceded by the defense.

So, you know, you -- there's a lot to -- there's still a lot to talk about in that arena.

THE COURT:  Okay.  Well, it sounds to me like there may be some lingering questions, but it also sounds to me like, from the nature of the settlement here, that I'd rather have the plaintiffs' side than the defendants' side when it comes to that, so...

Let's talk about some of these other collateral motions, and I -- I -- I frankly didn't spend as much time with the incentive fee award stuff.  The answer to this question may well be in the attachments that were submitted, but I think you had indicated -- or the briefs indicate that there was something like 1,500 hours or something that was spent by the trust.  Who -- who -- who exactly are we talking about, and what sorts of activities were they involved in?

MR. PATE:  Sure.  So, just to clarify one thing, Your

15

Honor, the 1,500 hours -- I believe that is referring to counsel time in the motion for attorneys' fees. Our firm, Nix, Patterson, had about 1,500 hours of time in the case.

The hours for the case contribution award for the Miller trust -- the hours that they put in their -- in the declaration from the cotrustees combined -- was about 240 hours, I believe --

THE COURT:  Okay.

MR. PATE:  -- of -- of combined time that they had put in.

That is -- I can -- I can confidently state that the trustees of the Miller trust were very involved in this case from start to finish in collecting documents, reviewing briefing, reviewing documents substantively.

As you know, this case was -- proceeded all the way to full briefing on class cert. We didn't end up having to have a hearing, but it was fully briefed and ready to go for a class certification, which means two of the cotrustees of the Miller trust were deposed, spent significant time preparing for those depositions. Mr. McClure took their -- their depositions; and then they participated in the settlement negotiations and discussions as well and approved everything and reviewed things, as we provided them, throughout the case. So they remained and do remain heavily involved in this case.

I did want -- I did want to raise this early on with Your

Honor.  Now's as good a time as any.  You'll notice that we do not have someone from the Miller trust here with us today.  The reason for that, Your Honor, is because -- as you know, the -- the plaintiff in this case is the trust.  It's the Don Miller Revocable Trust.  One of the cotrustees is Don Miller himself. I'm sad to report that he tragically passed away two nights ago, and I found out about that yesterday morning.  He had been battling cancer.

It doesn't affect anything for purposes of the -- the settlement because the -- as you know, the -- the plaintiff is the trust, which remains an entity, and it has other cotrustees who already have participated in this case and will continue to participate in the case, but I wanted -- they asked me to explain why -- why they didn't have someone here.

And they offered to be here.  His daughter Tina Walker, who's one of the cotrustees, offered to be here.  I -- I told her, given that there's no objections, I recommended that she be with her family right now.  I hope that was not presumptuous of me, Your Honor.

THE COURT:  I wouldn't argue with that.

MR. PATE:  So -- but both of them -- Ms. Walker and Mr. Miller -- and his son as well spent a significant amount of time in this case, Your Honor, and participated in helping us getting it resolved.  So we believe that the request for $30,000 of a case contribution award is fair, reasonable, and

17

supported by the record.

THE COURT: All right. Let's talk about the attorneys' fees, and I'll -- I'll tell you at the outset that's the only aspect of this that I have any significant concerns about --

MR. PATE: Okay.

THE COURT: -- and that is the question of whether, in the particular circumstances of this case, the 40 percent number's justified.

So, I mean, I've looked at a lot of your stuff, and -- and I -- I guess the sorts of things -- just to -- rather than leave you standing up there, repeating stuff that you've already told me, I'll -- I'll flag for you the -- the aspects of this that concern me.

One is that -- or the principal thing, I think, is that the -- essentially, the adequacy -- or the reasonableness, I should say, of the 40 percent recovery. You've submitted a lot of stuff and a lot of experts saying that's reasonable but almost without exception likening this to an oil and gas royalty case. This, of course, is a statutory interest case. And it seems to me, at least from my vantage point, that that's -- that you can't assume they're the same thing, and I -- I -- I guess I -- I want to give you a chance to address that.

MR. PATE: I would love to address that, Your Honor.

So we cited a number of -- just starting with your question about the cases that we analogized to oil and gas royalty cases, a number of the cases we've included in our briefing related to attorneys' fees are statutory interest cases.  There's, I believe, at least six different cases stated in there:  the *Chieftain v. Marathon* case, the *Reirdon v. Cimarex* case, *Reirdon v. XTO*, *McClintock v. Enterprise*.  I can't remember how the briefing lines up as far as the timing on whether that one was finally approved by the time we submitted our papers here, but it has been finally approved now.  And I think I'm leaving one -- the *Chieftain v. Newfield* case, Your Honor.

All of those were statutory interest cases, and I may be leaving one or two out, but those are included in our briefing, and every single one of them to a T was a 40 percent fee that was awarded in that case.

Our percentage of recovery is actually higher in this case than it was in certain of those cases.  Those are all, we think, very high "percentage of recovery" cases.  I don't think there's any of them that are less than 80 percent recovery but were even higher -- we are able to get even better result in this case, we think, for the class.

In addition, this case was litigated all the way to full class cert briefing as well whereas some of those cases were not.

And the main thing, I think, Your Honor -- or the first thing that I would always point to in this situation is that -- is the notice that went out. We -- we specifically advised the class that we would seek 40 percent fees at $3.96 million; and there were zero objections; and, in fact, we actually have five absent class members who weighed in, in support of the attorneys' fees, the expenses, and the case contribution award here in addition to the class representative himself.

So all of that put together, Your Honor, along -- you know, and I won't rehash all of the evidence that we've included as I know you've -- you've got the lengthy declarations and all of the evidentiary support that we put in, but we think that the 40 percent fee is actual the -- actually the -- the market rate for a statutory interest case and what has been awarded.

I'm actually not aware of a statutory interest case where less than 40 percent was awarded.

I take that back. I'm sorry, Your Honor. Just to be -- the *McClintock v. Continuum* case -- we were counsel in that case. That -- the defendant in that case was -- had an "ability to pay" situation, and so the settlement in that case was less than a million dollars, and so we asked for a lesser fee in that case to try to, you know, just help out with that situation.

But that was a fairly unique circumstance, Your Honor.

20

Every single other case that we've had that's a statutory interest case -- and that's included in those briefs -- the attorneys' fees were awarded at 40 percent.

THE COURT:  In the -- in the statutory interest cases that you've had or for that matter that you know of, do you know of any situation where a Court has ever denied the motion to certify?

MR. PATE:  A contested --

THE COURT:  Yes.

MR. PATE:  -- class cert motion?

THE COURT:  Yes.

MR. PATE:  No.  I believe that the only -- the only statutory interest case that I'm aware of that has proceeded to a decision on -- a contested decision is the *Cline v. Sunoco* case, Your Honor, in which certification was granted, and the case went to trial.

THE COURT:  That's -- okay.

That's the Eastern District case you were talking about a second --

MR. PATE:  Yes, sir.

THE COURT:  Yeah.

Okay.  Well, I'm not surprised by that because -- I mean, it -- I didn't get to the point of ruling on the certification motion here, but we were close, and it did appear to me that the -- you know, I think your -- your Professor Miller expert

says this is the quintessential example of what the class-action mechanism is for, and that kind of seemed to me that was an accurate statement here.

You know, in some of the royalty cases, we end up arguing about, you know, what the common questions are when you've got different leases and all of that kind of stuff, but, here, you know, you had a -- a -- a pretty obvious common question that had to be resolved, so...

MR. PATE:  We did, Your Honor.

I will say, you know, to the extent -- because, as far as, you know, speaking about -- it sounds like you're kind of touching on the things -- the difficulty of the case with respect to the *Johnson* factors and evaluating the fee.

THE COURT:  Yes.

MR. PATE:  And I will say that these cases are not easy.  You know, they may be different as far as the -- the issues that we face in them as far as establishing commonality and things like that, that -- that we have to fight, but I can -- I can safely say from being on the other side of Mr. McClure for probably the last five or six years that these --

THE COURT:  He's already established he can take two hours to answer some --

MR. PATE:  That's right.

THE COURT:  -- of his questions.

MR. PATE:  I've seen it.  I've seen it, Judge.

So, you know -- and I think you can tell by the amount of time that our firm invested in this case as well that there are certain aspects of these cases that are easier than a -- an implied covenant-type oil and gas -- oil and gas case, but there are other things that we face here that we may not face in those cases.

And we also are continuing to go up against -- not to keep pointing my finger at Mr. McClure but defendants who are willing to take these cases to trial.  We just tried one, which is very rare to have tried a oil and gas class action, I think, Your Honor.  That doesn't happen every day -- for -- once the class gets certified to actually go through a full trial.

There are issues -- a lot of issues related to actually doing the work to identify all the late payments, establish the amount of interest that is owed on every single one of those, which is done on a payment-by-payment basis with our expert, and then disputed at different times in different ways.

So there's a lot of evidentiary fights that -- that happen and that continue in this case.  It's not just -- as we've seen, again, from the only case that was -- that was -- went to certification, once certification is done, the case is not over.

And we do a lot of work on the front end because bifurcation of discovery is not appropriate anymore under Rule

23, and Your Honor didn't order bifurcated discovery here.  So we spent all the time on the front end getting our case ready to trial before class cert so that we're ready to go, and that's what we did here, and, had this case continued to go to class certification, we would have been ready for trial shortly thereafter.

Again, as our only test case -- the *Cline v. Sunoco* case -- right after that case was certified -- I believe it was certified in -- I want to say October, maybe September, but I believe it was October, and we were at trial in December, two months later, and -- two to three months later.  I mean, it was that -- it was that quick.  We were ready.  And we went to trial and ended the whole case, and that's how we work up all our cases, and that's how we worked up this case, Your Honor.

THE COURT:  Uh-huh.

A lot of your written submissions are focused on -- and the -- and the input from your various experts is focused on the question of whether the -- using the percentage of recovery method is appropriate, and I -- I assume that's the -- because of the concern with the -- what was it?  The *Hess* case -- or what was the circuit case that --

MR. PATE:  The *Intervest* case?

THE COURT:  Yeah, that turned around the -- *Invest*, yes.

MR. PATE:  *Intervest*.

24

THE COURT: *Intervest*, yeah.

I don't -- it -- it appears to me from what you've said -- in particular, this reference to the *Stack* case that, I gather, has come down since all of that -- that there's really no -- I mean, you've got a lot of experts that say the Circuit was wrong, and maybe they were. Sometimes I think that too, but I still don't win.

But, in light of the *Stack* case, it sounds to me as though the question's kind of gone away, hasn't it?

I mean, you -- you -- you spent a lot of time convincing me that I should --

MR. PATE: Sure.

THE COURT: -- respect the parties' contractual adoption of federal standards --

MR. PATE: Right.

THE COURT: -- and -- and I'm just curious as to your view as to how -- how important that is at this point.

MR. PATE: Well, so that was going to be my response, Your Honor -- was that, essentially, the *Intervest* case and the *Strack* (phonetic) case that has answered some questions that were attempted to be addressed by the Tenth Circuit in the -- in the *Intervest* case really isn't relevant, we don't think, to your decision. We've provided the information, but, because the parties have contractually agreed to federal common law, which wasn't the issue in the *Intervest* case -- the *Intervest*

case was about applying state law in a federal class action.

Here, because the parties have agreed to apply federal common law, then we are strictly looking at the *Johnson* factors for attorneys' fees, Your Honor, and I don't think there's really any dispute about that.  That has been approved repeatedly in district courts both in the Western District of Oklahoma and the Eastern District of Oklahoma.

And so, really, to answer your question simply, yes, I think that the *Strack* case provides some answers that were raised by the --

THE COURT:  It's *Strack*?

MR. PATE:  It's *Strack*.

THE COURT:  *Strack.*  Okay.

MR. PATE:  But they don't matter for today, really, in our view, Your Honor, because you're strictly looking at federal common law, which there's no dispute that under that scheme you're looking at the percentage of the common fund based on the *Johnson* factors, which we've outlined in our briefs.

THE COURT:  All right.  Well, I just wanted to make sure there wasn't some additional issue lurking that wasn't obvious to me because you spent quite a bit of time analyzing that issue, and you're a cautious group of folks --

MR. PATE:  We are.

THE COURT:  -- and thorough, and I appreciate that

but...

Well, in terms of the *Johnson* factors, we've -- we've already talked about some of them here. I -- I will tell you -- I know your briefing talks about how some judges will use the lodestar method as a cross-check, and some don't. I'm one that does. I -- I -- it has always seemed to me that, although the lodestar method is not the method you're using to determine the fee, it's a -- it's at least a useful indicator of, you know, potentially the complexity of the case, and the -- the -- the -- you know, the amount of time spent and all of that has something to do with it.

Here, I -- I mean, as I did the math in terms of your -- if I -- I -- I went ahead and forced the lodestar calculation based on the numbers you'd given as to hourly rates and so on, and I don't see any basis for questioning the rates. I mean, I -- I've had Mr. Duck in front of me, and I'm -- I almost think he may be worth $700 an hour, and I --

MR. PATE: Almost.

THE COURT: It -- you know, these -- these hourly rate discussions always make me feel so damned ancient. I mean, it's not -- it's not -- and it's not even the hourly rates of the lawyers that bug me. The -- the part that wears me down is when I see that the paralegals are getting paid six times what I got billed out for as an associate attorney, and, you know, I thought we were kind of getting away with stuff

then, but, of course, that was well into the last century, so I -- I realize that doesn't have a whole lot of application here given the inflation in the meantime but...

In any event, I -- I accept the hourly rates as being customary. You guys are -- are certainly accomplished class-action lawyers, and -- and it's in a field where -- it's a very expertise-driven field. You've got to know the oil and gas business as well as the -- the players do, and it's in a very specialized area, and so I -- I don't -- I don't have any qualms about the rates you're charging.

But applying that to the hours you've indicated, I mean, you -- you haven't -- obviously, I haven't done what I would do in a lodestar calculation of looking --

MR. PATE: Right.

THE COURT: -- at time entries, but I -- I calculate the numbers at about -- I think it was around 830,000 is about what the Nix, Patterson numbers would have been; and then Mr. Burrage's firm was 20- or 30,000, somewhere with a -- in other words, a -- a lodestar number of about 850,000 ballpark. Is that accurate, as you see it?

MR. PATE: That sounds about right. I believe it may have been a little bit higher than that, Your Honor, when accounting for the -- what we typically do when we're providing our hours is we break out the hours that we've spent -- that we've already documented working on the case in the past and

then also include an estimate of future time, which we included here, I think.

I'm just looking at the declaration of Mr. Beckworth that was submitted on behalf of just my firm where we estimated for all attorneys that would be approximately 230 future hours. That was then added on top.

So I think that the number, in doing the math, if I remember right, comes out closer to -- to 900 between the two firms, but I was a history major, Your Honor, and -- and a philosophy minor, so they don't let me do math a lot at the firm.

THE COURT:  I -- I think you should defer to me then. I'm a political science major with a psychology minor.

MR. PATE:  There you go.  There you go.

THE COURT:  So...

MR. PATE:  So -- but it doesn't sound like we're too far off from -- from what you've counted, but it -- it's possible that we included -- when we did the -- the math ourselves that we included that future time, Your Honor, and I'm not sure that that was included in the numbers that -- that you ran to calculate it yourself.

I think, when -- when we looked at it that way, it was around 900 or a little bit north of 900 --

THE COURT:  Well --

MR. PATE:  -- which, Your Honor, if -- you know, and

I'll just kind of take that a little bit further since you -- you said that you do like to do a lodestar analysis just as far as a reasonableness check, it sounds like, a cross-check, not from the starting point.

THE COURT: Yes.

MR. PATE: Then, you know, I'll go ahead and tell you that I -- I think that comes out to just under a four multiplier, if I'm -- if I did my math right.

THE COURT: I think it's just over four, but that extra 30,000 or whatever you're talking about may have moved it.

MR. PATE: Somewhere in that range, Your Honor.

And, again, I would say -- pointing to other cases -- both oil and gas class actions under federal common law -- four times multiplier is -- is certainly within the norm, within the reasonableness spectrum that has been awarded before. It's not out of bounds with the other multipliers that we've seen in cases.

THE COURT: Well, I -- I recall in -- in -- you've got an affidavit in here from Professor Ginsler (phonetic) --

MR. PATE: Yes.

THE COURT: -- where he's talking about multipliers, I guess, based probably on state district court cases, and he was -- he was using 2.-something, up as high as 6.-something, and that the average was 3.7 or thereabouts. So I would take

it that's, again, a -- a -- sort of a ballpark multiplier to the extent you can superimpose that.

MR. PATE:  Right.

And I believe Professor Jeff Miller addressed the multiplier aspect in -- in his declaration as well and --

THE COURT:  Miller's -- Miller's stuff, as I recall, was suggesting a higher multiplier was reasonable, but I'm -- I'm not -- I don't recall exactly what he based that on.

MR. PATE:  Well, I think, if I -- Professor Miller does a lot of things in his declaration, including giving his extensive research on the hourly rates, but, with respect to the multipliers, I believe he provides citations to authorities that have gone as high as eight times multiplier in class-action context, Your Honor, so...

THE COURT:  Of course, I -- I -- I do recall, particularly with Miller and, I suppose, to some extent, with Ginsler as well, they were, again, likening the analysis to royalty cases.

MR. PATE:  Yes.

THE COURT:  Yeah.

All right.  All right.  What else do I need to know before I tell you what we're going to do here?

MR. PATE:  Your Honor, since there's no objections, I -- I really -- I -- I don't have anything else.  You know, as we said, from the start, you know, we submitted extensive

briefing and evidence to you.  So I've -- hopefully, I've answered your questions that -- that you have for me, but I don't have anything to add beyond -- beyond that, at this point, Your Honor.

THE COURT:  All right.  Mr. Duck or Mr. Burrage, do you want to add anything he missed?

MR. DUCK:  Nothing from me, Your Honor.  Thank you for your time.

MR. BURRAGE:  No, Your Honor.

MR. DUCK:  Although, with those compliments on the record, I might be needing to get a transcript.

THE COURT:  Well, the judge was a little -- he hadn't had his coffee yet when he said that, so...

Mr. McClure, anything you want to add to the mix here before we wrap this up?

MR. MCCLURE:  No, Your Honor.  We urge approval to settlement but take no position on the application for fees and case contribution award.

MR. PATE:  Your Honor, I -- I do want to just mention -- just because you didn't raise it, but you raised every other motion.  We do have our motion for expenses as well.  I assume you just had no questions about that and didn't need me to --

THE COURT:  That's -- that's correct, and I -- I assume the -- the expenses on the -- of Ms. Lay -- I assume

32

those are on -- out of the administrative money, the 300,000?

MR. PATE:  Well, no.  The -- the -- the expenses from Ms. Lay that are accounted for in Mr. Beckworth's declaration, if that's what you're referring to, Your Honor --

THE COURT:  I'm just -- you've got a 200,000 --

MR. PATE:  Right.

THE COURT:  -- number that's the litigation expense --

MR. PATE:  Right.

THE COURT:  -- and 300,000 that's the administrative stuff and --

MR. PATE:  So the -- the 200,000 is our litigation costs that we have incurred out of pocket.  That would include costs that we have paid to Barbara Lay for her work in this case as far as pursuing the litigation.

Now, she will assist J&D in administering and distributing the settlement proceeds pursuant to any orders you enter in your approval, and, for that, she would be compensated -- her consulting work -- under the settlement agreement, out of the administrative notice and distribution costs, Your Honor -- the 300 bucket.  But that -- so that bucket is set aside for J&D, its expenses, its fees, and any consulting experts they need to help them who typically is only Ms. Lay, and, occasionally, they need a landman to help them find some people.

THE COURT:  All right.  All right.  You can -- you

33

can take a seat.

MR. PATE:  Thank you, Your Honor.

THE COURT:  I'm...

Well, I've looked carefully at -- at this, as I do with all of these class actions.  Obviously, they're very involved ordinarily and present plenty of things to think about, but it does appear to me that the settlement that's been achieved here is -- is plainly a reasonable one and one that should be approved.

We have no objectors who have appeared.

And -- and the settlement, of course, itself, as we've discussed previously reflecting essentially 100 percent payment of alleged amounts due within the statute of limitations and a -- pretty close to that on amounts even that are subject to a potential statutory -- statute of limitations defense -- I -- I think that is obviously a very good recovery in the particular circumstances here.

As a result of that, I don't think it's necessary to belabor the other factors that -- that bear on the reasonableness determination, but, as I think I said at the preliminary approval hearing some months ago, I think there's no reason to question the -- the fact that there were significant negotiations involved with it -- good faith negotiations -- by parties and lawyers who know what they're doing.

It -- it appears to me that there is at least some question of law that remains unresolved. As I said earlier, it does sound to me like we're getting to the point where the -- the legal issue of whether or not the demand is necessary to be made is getting pretty close to being resolved, but we're not there yet.

And, while the extent of the settlement that the defendants agreed to, which, you know, comes pretty close to -- to surrendering on the merits, I think, at least in terms of the dollars involved, there's still a -- a -- a hope in question that the resolution of was advanced by the settlement here; and it does seem to me that in this case, as in most cases, it's in the interest of the parties to resolve it and move on down the road.

So I will approve the parties' motion for -- or grant the motion for approval of the settlement agreement. That's Document 82.

I will also conclude, in connection with that, that the notice to the class was reasonable under the circumstances and was the best practicable option for getting word to the class. Obviously, the use of the pay deck starts with a comprehensive listing of potential interest owners.

And, as counsel has suggested here today, the fact that there were a significant number of returns is -- is not, I think, problematic here based on the relatively small

percentage and the fact that people move, people change addresses; and that, I suspect, is the sort of practical challenge that companies making these payments deal with every day. So it seems to me that does not suggest any difficulty here with the notice to the class, so I will approve the notice.

I will also approve the related issue of the allocation methodology that's been proposed here. I guess what -- what you're asking for at this point is simply approval of the initial plan of allocation, which would involve some additional work, then, before a final allocation plan is presented to me, but the allocation plan appears unobjectionable to me, and so it will be approved as well.

And, as a part of that, of course, I think it's appropriate that judgment enter for the -- pursuant to the settlement agreement dismissing the claims against the defendants with prejudice and releasing the various claims consistent with their treatment in the settlement agreement.

I will approve or grant the motion relating to approval of litigation expenses -- that's Number 86 -- which seeks approval up to 200,000 for the litigation expenses and up to 300,000 on the case administrative expenses relating to the distributions and so on.

I will also grant the parties' motion for case contribution award in the amount of $30,000 to the trust.

That's Document Number 88. It appears to me that the -- that that is appropriate in terms of not only the time spent by the cotrustees but, in the -- in the broader scheme of things, at least bears an appropriate relationship to the ultimate recovery that was procured for the class.

That leaves the issue of the attorneys' fees, and the attorneys' fee question in these kinds of cases is -- to me, it's always a hard question partly because it's -- the -- the attorneys' fees are so big that it does have a major impact on the -- the net recovery by each of the class members, but it's, I suppose, more -- more than that. It's difficult because I make these attorneys' fee decisions without the benefit of the adversary process that I ordinarily have in -- in matters of this sort.

Here, we have a -- a very comprehensive presentation of the plaintiffs' fee position that is as thorough as their presentations have been -- or that counsels' presentations have been on other issues in the case, but there's nobody here to -- to poke holes in it.

And it does seem to me that part of my responsibility in approving these settlements is to recognize that part of what the people were agreeing to -- or agreeing to by failing to object was to an attorney's fee that would not exceed 40 percent but that was, in any event, subject to some kind of a reasonableness review by me. So I think that obliges me to do

37

that sort of review even in the absence of objection or the absence of an adversary party to assist me with it.

It does seem to me, based on the extent of the recovery, that this is a case where a substantial fee is warranted, certainly; and I think, in -- in calculating that fee, I -- I find and conclude that the "percentage of the fund" method is the appropriate way to calculate that here.  That is the approach that the Tenth Circuit prefers in cases of this sort.

I realize this case started out in -- in state court, but we do have here the -- essentially, the parties' agreement, as it relates to the treatment of the fee issue and the developments in -- in state court litigation, since this began with the *Strack* case and otherwise, leave me persuaded that the "percentage of the fund" method is the appropriate method for doing that.

Under the various authorities, the -- the question of determining the reasonableness of the fee under the "percentage of the fund" method is -- is a matter of applying the *Johnson* factors.  That requires -- there are a dozen of them.  Some of them are more important than others.  Some don't fit at all. But at least I have looked at the fee request here with all of them in mind.  Some of them, like the, you know, time constraints imposed by the client, don't -- don't have any impact here, it seems to me -- or -- or any -- minimal impact.

The cases indicate that you should start by considering

the -- the extent of the recovery.  How good -- how good a settlement was it?

And it seems to me that this was an excellent settlement. As I say, based on the numbers the defendant agreed to pay, it was pretty much -- pretty close to a surrender, and so there was a -- an excellent result here that was achieved on behalf of the class.

I recognize too that the -- the skill of the lawyers that is involved is something that I must always consider.  That is, I think, beyond question, a -- a factor supporting a substantial fee here.  I'm familiar with these plaintiffs' counsel in -- in this case and in -- we've got another one where the scrapping is even longer running than what we have here, and I have always been impressed by the -- the quality of the representation that has been applied in these cases.

And, as I -- as I said, I think the -- the nature of them is such that that level of -- of competence is -- is almost a requirement, if there's going to be decent representation of a class, simply because of the -- the -- the factual complexity of the circumstances that attend many of the issues that arise in the oil and gas business.

I think that is -- that is particularly true when you're dealing with the -- I think what we've got in some of these other cases where you -- you've got to try to explain to me and convince me how the gas marketing process works and all of

that, and there are enough moving parts there that it is a matter of incredible complexity, at least to someone whose experience in the oil and gas business more or less ended with Professor Kuntz about 40 years ago.  So I do recognize that there is a substantial level of -- of skill on the part of lawyers that was certainly reflected here in this case.

I'm also required to consider the time and labor involved in it.  That -- that's the -- as I said earlier, the reason why one of the things, even in a "percentage of the funds" situation, I try to consider the -- the lodestar approach as a cross-check on it.  Here, we're talking about -- the indications are somewhere in the neighborhood of 1,600 hours being spent by the two firms or perhaps slightly more than that based on estimates of -- of postorder efforts.  That result in a -- a lodestar fee -- were we doing this on a lodestar basis -- of something in the range of 850- to $900,000.

The fee that is sought here, which is the, what, 3 million -- 3 million 960, is, of course, substantially in excess of that, but I recognize, of course, that this is a contingent fee case and that it has all of the variables that are involved in -- in contingent fee cases.

I -- I do think the contingencies here are perhaps less -- less substantial than they are in some of the oil and gas royalty cases.  That's part of the reason I asked Mr. Pate whether he knew of any situations where class certification in

40

a statutory interest rate case had been denied, and he indicated no.  That's consistent with my own knowledge to -- to the extent that I would have any basis to know.  I don't know of any either.  And it does seem to me that these statutory interest cases are ones where certification is considerably easier to establish than it might be in other contexts.

So, although there is an element of risk that, you know, conceivably, someone may end up putting a lot of time and effort into this and then being denied certification, I think, as a practical matter, that is -- is less a factor in these statutory interest cases than in -- than in other oil and gas cases.

But, nonetheless, it is a contingent case.  It requires the advancing of substantial litigation expenses, and, of course, there's always the possibility of nonpayment. That's -- ordinarily, with the defendants in these cases, the depth of their pockets are such that that's not a huge issue but sometimes could be.  And so, in any event, I do recognize the -- the contingent nature of it, and -- and that suggests, in my view, a -- a fee in excess of a loadstar amount is -- is plainly warranted.

I'm also required to consider the difficulty of the questions presented and the novelty of them.  As I suggested in my questions to Mr. Pate, it does seem to me that what is significant and important to keep in mind here is that this is

not a royalty case.  It's a statutory interest case.

I appreciate the fact that, as Mr. Pate has indicated, there have been some courts that have apparently still employed the 40 percent number as an appropriate spot to land on, and I suspect that was due to accepting the idea that there's more or less a market rate established for these kinds of cases, but it does seem to me that it's important to keep in mind that there is a distinction -- or at least I see a distinction in terms of the difficulty of the cases between the statutory interest case and a royalty case.

I mean, in the royalty matters that we're dealing with, we get into all the variations of, you know, when gas is marketable, and we fight over what middle step means or doesn't mean, and we worry about the impact of potentially hundreds of different kinds of lease terms and all of that, and it becomes an ordinarily -- or it becomes an unusually convoluted and complicated mess.

And, here, it seems to me that these statutory interest cases -- I -- I would not suggest this was an easy case by any stretch.  That would be an insult to Mr. McClure if I were to suggest that.  I have no doubt that, in this case, as in all these cases, it was vigorously defended based on every procedural or substantive defense that was available, and so I recognize it is a difficult case.

But I do think, in terms of the degree of difficulty, that

there is a significant difference between this and a royalty case. I mean, it would seem to me that, you know, obviously, there's going to be a substantial amount of discovery involved to figure out what the defendant is doing and how he was paying or what the basis would have been for paying if they had timely paid.

But the -- the threshold question, it seems to me, and the question that is the -- truly, the big one in these statutory interest cases is ultimately the legal question of whether or not a demand is necessary to trigger the obligation to pay. Once you get past that issue, then it becomes -- I'm not going to say it's just a plain ole math problem, but it at least becomes a whole lot simpler, it seems to me, once that principle is established, to then work on through the various ramifications and so on to figure out what the ultimate recovery by class members would be.

So I -- I do think that the result is that, in this kind of a case -- that the difficulty of it and the novelty of it are -- are appreciably less than would be true in the royalty cases that many of the experts and, I think, other courts have sometimes looked to as the basis for concluding what a reasonable fee is here.

The -- as I said at the outset, I -- I do try to at least look to the lodestar amount as a cross-check of the courts that have used that approach. The -- the result has been a

multiplier that is, if not explicitly used, at least -- effectively emerges from the -- the process that the Court goes through.

And, as I suggested, Professor Ginsler's submissions here indicate that, at least looking at -- I think he was focused principally on district court decisions in Oklahoma but perhaps others suggesting that the -- that there is a range of multipliers that have resulted in those courts, which employ some sort of cross-check vehicle, and he came to the conclusion that the -- the -- on average, it was about 3.7.

The -- the fees sought here is -- is in excess of that.  I calculated it somewhere up in the 4.6 range.  I think that would perhaps be a bit lower, in the 4.2 or 4.3, somewhere in there, depending on the estimates of additional time to be spent.

But, in any event, it does seem to me that, when you consider principally the -- the differences between these cases and royalty cases, that it -- it -- it becomes considerably more difficult to -- to employ the royalty benchmarks or -- or market rates in -- in cases like this, and, as a result, it seems to me that the full fee that has been sought here -- the three million nine -- is higher than what is reasonable after considering all of the *Johnson* factors.

This is a "percentage" -- "percentage of the recovery" approach that we're using, and it seems to me, as I have

44

evaluated all of the -- all 12 of the factors -- again, some of them applying more than others -- that a more appropriate result here is to base the fee on a 35 percent recovery rather than a 40 percent recovery, and, as I say, that is due in substantial part to my assessment of the -- the difference in the degree of difficulty and so on that's involved with a interest case as opposed to a royalty case.

Certainly, in no way intend to -- to suggest anything other than full endorsement of the efforts of -- of plaintiffs' counsel, but I -- I do think that, in -- in this case, the lesser amount of 35 percent is appropriate, which would translate into a fee of $3,465,000.  By my calculation, that is still, to the extent I'm doing a cross-check against a lodestar amount -- that would still involve a multiplier in excess of four, which would be above the average that was identified by Ginsler, and it seems to me that that is an amount which is still a lot of money.

And it is, I think, sufficient to take into account the various variables that are involved in these contingent fee cases and to provide a -- a recovery that's sufficient to incentivize lawyers to take cases like this, to invest the time in them that is involved, and -- and the other factors that are identified.

So, as a result, I will grant the plaintiffs' motion for attorneys' fees -- that's Document 84 -- and will grant a

reasonable attorneys' fee in the amount of $3,465,000.

I think that resolves everything that I had explicitly teed up by the pending motions.  Is there anything else that the parties see that we need to address today?

MR. PATE:  No, Your Honor.  Not from the plaintiffs' perspective.

Would you like us to submit a revised proposed order to you?

It sounded like you had already seen some things in there you had intended to edit, but we can do it however you like.

THE COURT:  I don't -- the -- the thing I was going to edit was the part about the --

MR. PATE:  Considering objection?

THE COURT:  -- reject -- rejecting the objections that weren't raised --

MR. PATE:  Right.

THE COURT:  -- that -- that part, but, apart from that, I don't know that I had any difficulties with it.

MR. PATE:  Okay.

THE COURT:  So I think we've got that in Word Perfect form --

MR. PATE:  Okay.

THE COURT:  -- or Word format.  We can revise that without any...

I think the other orders that you had proposed on the

other motions, I think, would be unaffected by what I have done here.  Even the order approving the initial distribution method, as I recall, did not have an amount in it.  So there would need to be -- Ms. Lay or somebody --

MR. PATE:  Right.

THE COURT:  -- would need to recalculate a net settlement amount based on the fee number I've used, which would result, I think, in a -- the -- in the -- the final order you'll want me to approve.

MR. PATE:  That will come into play on the final plan of allocation, Your Honor, but it -- you're right.  It doesn't impact anything that we've asked you to sign so far, including the initial plan of allocation order.  That's why we do it in two phases.  So, as long as you have what you need from us -- I just wanted to the make sure --

THE COURT:  I -- I think we do.  I -- I think we have everything that we can -- that need to -- to get this moved forward, and we'll try to get that out promptly.

MR. PATE:  One -- if I -- if I can just make one point on that, Your Honor.

THE COURT:  Sure.

MR. PATE:  The final approval order that we submitted references in Exhibit 1 to identify the requests for exclusion that are being acknowledged and who's opted out.

THE COURT:  It wasn't attached, but it's attached to

that other declaration?

MR. PATE:  That's correct.  It's attached to the J&D declaration, Your Honor.  I have printed copies here today, if you would like one, or, if it's easier, to pull it from -- from the J&D declaration, however you would prefer to do it.

THE COURT:  I think all we would need to do is just to revise the order to refer to the --

MR. PATE:  That works as well.

THE COURT:  -- exhibit to the other --

MR. PATE:  Correct.  Sure.

THE COURT:  -- rather than the -- yeah.  Okay.

MR. PATE:  Understood.

THE COURT:  We can do that.

MR. PATE:  Okay.  Thank you.

THE COURT:  All right.  Mr. McClure, anything you want to add to the mix here?

MR. MCCLURE:  No.  No, Your Honor.  Nothing further from the defendants.  Thank you.

THE COURT:  All right.  Then we've got -- we'll get that order entered.  That would trigger, then, the 60-day time period for you guys crunching the numbers and coming up with the final distribution.  So I assume, then, that would be the next thing I'd be looking for from you guys.

MR. PATE:  Yes, Your Honor.  That's correct.

THE COURT:  Okay.  We'll keep an eye peeled for that.

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  Cassandra_Kerr@okwd.uscourts.gov

48

We'll get an order out shortly, and see y'all down the line.

Court's in recess.

(The proceeding is concluded.)

REPORTER'S CERTIFICATE

I, CASSY KERR, Federal Official Court Reporter in and for the United States District Court for the Western District of Oklahoma, do hereby certify that, pursuant to 28 U.S. Code 753, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED THIS 7th day of July, 2021.


/s/Cassy Kerr
Cassy Kerr, CSR, CCR, RPR, CRR, CRC, NP-OK
Oklahoma CSR License No. 1367
Federal Official Court Reporter

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  Cassandra_Kerr@okwd.uscourts.gov